Please the court, opposing counsel, my name is Thomas Madden and I represent the appellant warden David Bobby and today's proceedings. I would like to reserve six minutes for rebuttal. Today I will focus on two issues briefed before the court. The first issue we believe the district court got right and the second issue we contend the district court got wrong. The first issue is whether the Ohio Supreme Court's denial of Trimble's bias juror claim was, quote, adjudicated on the merits and thus entitled to a depideference. Looking at paragraphs 68 and 70 of the Ohio Supreme Court's opinion, there is no question that Trimble's claim was reviewed on the merits by the Ohio Supreme Court. They looked at the law, they looked at the arguments raised by the parties, they applied the law to the facts and came to a conclusion denying the federal claim. So we think that the argument raised by the opposing counsel is wrong on that issue. The second issue is whether the Ohio Supreme Court's denial of Trimble's bias juror claim was reasonable. We think that it was. The district court did not pay enough deference to the Ohio Supreme Court's affirmance of the trial judge's factual findings. The trial judge who was sitting at the trial observing Juror 139 made several key factual findings that are entitled to deference. The first is that Juror 139 would follow the court's instructions, that Juror 139 would consider Trimble's proffer of mitigation, which in this case he had quite a bit, and that Juror 139 would not automatically impose the death penalty. These factual findings are supported by the record and therefore the Ohio Supreme Court's affirmation of those factual findings are entitled to deference. Now, I'll get back to my first argument. In paragraph 68 of the Ohio Supreme Court's opinion, they correctly state the correct standard under Morgan v. Illinois regarding allegations that a juror would automatically vote for death regardless of instructions. In paragraph 70, they specifically cite to the Juror 139, because this was not just brought on a claim of one juror, this was a bunch of claims regarding a bunch of jurors who they said would automatically impose death. And Juror 139 was only one of many. And in paragraph 70, the Ohio Supreme Court acknowledged that Juror 139 believed in an eye for an eye. Basically, he was an Old Testament kind of guy. The Ohio Supreme Court correctly noted there's nothing wrong with that. Jurors do not have to be ambivalent towards the death penalty in order to serve. The Ohio Supreme Court also noted that Juror 139 assured the trial court that he would listen to the evidence and vote for a life sentence if the mitigation outweighed the aggravating factors. The Ohio Supreme Court specifically found that Juror 139's responses showed that he was not automatically going to vote for death. So there we have an adjudication on the merits. Look at Johnson v. Williams, a United States Supreme Court case that was recently decided. In that case, they specifically tell the lower courts how to define an adjudication on the merits. And they say, if a claim is raised, and it's a federal claim, and the state court looks at the arguments of the parties, notes their arguments, makes citations to the record, and then denies the claim, there is no question. They cited Black's Law Dictionary on this 9th edition. There's no question that that's an adjudication on the merits. In fact, in Harrington v. Richter, they had gone even further and said, we assume, unless it is clearly based on procedural grounds alone, we will assume that the denial is based on the merits. And this goes back to the Supreme Court case a few years ago where the Inmate Spees Act brought 60 claims. And the United States Supreme Court says, listen, we're not going to hold the state courts to some unreasonable burden of, did you say enough about each specific claim in order to be given deference? We're going to give the state courts the benefit of the doubt. We're not here to instruct the state courts how they should or should not write their opinions. The Ohio Supreme Court first said that the defendant waived it because he could have used this peremptory challenge. Yes, sir. But you say that, really, it went on to rule on the merits. As an alternative, is that what you're saying? Yes, Your Honor. And that goes back to Harris v. Reed in footnote 12. And Harris v. Reed in footnote 12, the Supreme Court started this long line of cases that say, listen, we are not going to discourage state courts from doing alternative merits analysis by saying it's either, oh, or. This is a mutually exclusive choice. You're either going to find a procedural ground or you're going to review it on the merits. And as Judge Sutton explained recently in the Jenkins case, this is not a mutually exclusive thing. Now, recently there was a letter sent which talked about a footnote in Jenkins where there was a contention made that this court has a long history of that plain error review is not an adjudication on the merits for purposes of statute. And I'd like to address that head on. First of all, I don't think that's accurate. The only case that speaks to this is Fleming v. Metrish. Fleming v. Metrish, this court rejected the argument that a dependence did not apply to a Michigan Court of Appeals plain error review of a constitutional claim. The court said that if there's a reasoned elaboration on the issues, then you should give a dependence to the state court. And that just because there's a procedural default doesn't mean the state court's substantive analysis somehow vanishes, and so does ADEPA. They also rejected the argument that there was a distinction in which the state court merely addresses an argument on the merits and those that are adjudication on the merits. I think you have to go back to Congress's plain language in the statute. Congress said any claim adjudicated on the merits shall be given ADEPA deference. It doesn't say any claim adjudicated on the merits unless a procedural default is found. In fact, if you read 2254D or any part of the ADEPA statute, there's nothing that even talks about procedural default. It talks a little bit about exhaustion, but the word procedural default's never mentioned. Congress only said give deference to claims adjudicated on the merits. Also, you can look to decisions by this court, one written by you, Judge Seiler, Scott v. Mitchell and Brooks v. Bagley that said, oh, if you have a res judicata imposition and then alternative analysis, we'll give ADEPA deference to the alternative analysis. There's really no distinction between res judicata and plain error review. In fact, this court used in United States v. Bostick consistently, I read the decisions from this court, consistently tells defense attorneys, listen, make your objection at the end of sentencing. If not, be specific. If not, we're going to do plain error review. That's the same rule that the state courts apply here. And for this court to say, it would be unreasonable for this court to say, oh, we're going to hold a disadvantage to the state courts. We're not going to pay deference to the state courts if they apply the same rule that we apply based on the same reasons. And the reasons is this. If you're a trial attorney and you're trying a case, you have an obligation to make an objection. And trial judges, they'll fix it if they're just notified about it. But what trial judges don't want is for the defense attorney to sit quietly or the prosecutor or whomever to sit quietly, not say anything, and then raise the first issue on appeal. The trial court erred because of these five reasons when those five reasons were never brought to his attention for him to fix. Now, if you go to the footnote five in Frazier v. Jenkins, which was a big deal in this case, Judge Moore indicated that there was these five cases that strongly support the notion that plain error review is not the equivalent to an adjudication on the merits. I would respectfully disagree based on the same reasoning that the authoring judge gave in Fleming v. Mectris. All these cases before Fleming dealt with the argument, oh, you did plain error review, therefore the procedural default doesn't count. You denied the claim, therefore the procedural default does not count. None of these cases hold. So this court is not bound by any of these cases cited in this footnote, whether they be Gertz v. Unai, Keith v. Mitchell, Scott v. Mitchell, Taylor v. McKee. The closest case is this Lundgren v. Mitchell that was back in 2006. And only in that case it said it was the same issue. It was procedural default. Counsel, let me ask you this. In terms of this plain error review issue and the argument that you're making, if I understand it correctly, if the Ohio courts did not actually enforce the Ohio procedural rule barring the petitioner's claim for failure to exercise all his preemptory strikes, and you may not agree with that, but if you indulge me, if Ohio doesn't regularly enforce that rule, then what does that do to our ability to review the issue? Well, first of all, I'm more concerned about the adjudication on the merits than I am about protecting the procedural default. But I will say this. When I first read the district court's opinion, I thought it was totally unfair to the state court because he had indicated that the state v. Eaton is not regularly followed and only haphazardly applied. And that is just not the case. I've read case after case after case where the rule is perfectly clear. If you have a juror sitting there and you want the juror off, you've got to use your preemptories. But does that apply in the specific type of situation that occurred here where the preemptories, well, because the jurors were seated, the preemptories were exercised, and then they went to the alternates? And so if you didn't use all of your preemptories on the jury as a whole, why does that carry over to the separate procedure of selecting the alternates? Well, you know, jury selection is an art more than a science. You are sitting there watching the jurors come in. I know how you do jury selection. Yes, ma'am. But that's not answering my question. My question is, if the main jury was seated and you had your chance to exercise your preemptories and, you know, you passed up, you had one left on the table, that's not a carryover from anything I've ever seen to the selection of the alternates. So when it came time to choose the alternates, the trial court said, okay, you each get two, and we're going to seat four alternates. There was not a leftover preemptory as to the alternates, as I understand this. That you're absolutely correct. So you have this bunch over here, which don't really have anything to say about this bunch over here. What you did in selecting the jury, the main jury, really is no longer material with regard to the selection of the alternates. My only response to this is this. The Ohio Supreme Court is entitled to deference on the interpretation of its own rules. And I don't have any problem with that view. My problem then comes with saying, since there's virtually no law out there, except for one unpublished case, dealing with this issue of preemptories after the jury is chosen and now we have a separate set and we're dealing with the alternates, there's almost nothing out there. And in order to have an established rule which is consistently applied, don't you have to have some evidence that it's actually happened enough times that there could be a rule that could then be consistently applied? Your Honor, what the case law says, in my understanding, is if you have a situation arise that's completely different than anything else, then that doesn't make a firmly established rule suddenly become not firmly established. But it certainly might mean that that firmly established rule doesn't apply to these circumstances. Arguably, yes. So my next question would be, so let's suppose that we don't have a procedural default here. Let's suppose that there just isn't a rule that is firmly established and consistently applied because this just doesn't come up. Yes, ma'am. Suppose we were to say, we don't think a plain error review of this issue was appropriate. What would you then say about a de novo review of the question of whether this juror should have been struck? Absolutely not. There's no question that paragraph 68 and 70, the Supreme Court of Ohio adjudicated this federal claim. You know, defending the procedural default is one thing. But the Supreme Court did say that it was applying plain error review. It did say that beforehand when it was talking about all the jurors in a whole because this wasn't just juror 139. This was juror 139, 133, and a group of others. But then it separately, in paragraph 68 and 70, did everything that the United States Supreme Court told them to do when adjudicating a claim under Johnson v. Williams. Look at the arguments by the parties. Look at the record and make a decision. So you're saying that your view would be it doesn't matter what level of review we give it. There's no error here in finding that the trial court did not err in refusing to strike this juror. I think I pass under de novo review or a def a deference, but I definitely don't want to give up a def a deference in this case. I think that if you look, and that gives me back to the second argument, whether the trial court and the Ohio Supreme Court's affirmance was reasonable, and I think that it was. I think if you read this instruction and read this juror's transcripts and how it differs from other cases that you see, first of all you had a brief instruction, which is about two pages, from the trial judge bringing them up to speed on the bifurcated process. Juror 139 is just some guy off the street, never heard of bifurcated trials, never heard of any of these things, and he's trying to explain it to him for the first time. Next, the prosecutor gets up and speaks for about six or seven pages. The prosecutor starts to try to explain the bifurcated process again and starts to inquire into Juror 139, and at that point it becomes obviously clear that he doesn't understand it. That's not a big surprise. A lot of people don't. And he tries then to explain it to him. And then as he tries to explain it, the prosecutor is able to then get confirmation from 139 that he has a general understanding of, although his personal beliefs are an eye for an eye, he has a general understanding of how the bifurcated process works. Then the defense attorney comes in, and the defense attorney says, Hey, why don't we come back to your personal beliefs? Forget what the law, you know, we'll get to that in a minute, but let's get back to your personal beliefs. And prosecutors tell me that this is called the Colorado Method, and it's an attempt to get a long, drawn-out discussion where they confuse the distinction between what the law is and what their personal beliefs are. The problem seemed to be to me that during this lengthy voir dire, the juror of 139 never indicated or acknowledged a correct understanding of the instructions he would receive from the court. He misstated. Oftentimes the lawyer would tell him what the correct legal standard, and he'd immediately misstated, and I don't see where he ever stated it correctly, and he seemed to have repeatedly said that he thought he should vote guilty. Rather than follow the instructions of the court, he should vote guilty if he personally thought the man was guilty, which is not what the jury instructions would be. There was a real confusion as to the guilt phase. There's no question the juror of 139 had confusion. Okay, there was a confusion on two issues. One, the guilt phase, the bifurcated process when the guilt fade to the penalty phase. Then there was a confusion as to what mitigation and how does it work in Ohio. These are not easy concepts. They're pretty complicated. So there was an attempt by the prosecutor to work him through it. Now there was an obvious attempt by the defense attorney to conflate the issues. And basically what you'll see is that if you're talking about his personal beliefs, if the defense attorney is asking him about his personal beliefs, he's all about, you know, Ivor and I, yes, that's my personal beliefs. But then when they get into, okay, here's what the law, and the important distinction here, this is not like those cases where they keep going back to the prosecutor, where the one guy says, I don't understand what's going on, Ivor and I, and then going back to the prosecutor and the prosecutor is just giving these open-ended questions. I mean, not closed-ended questions. He's just nodding his head yes the whole time. This never left the defense attorney. You went from the trial court to the prosecutor and then to the defense attorney. And when the defense attorney quit asking about his personal beliefs and started asking about the law, you had a genuine attempt by Juror 139 to give his explanation, which is just some guy off the street, as what his belief in mitigation is. And I've got it right here. It is, excuse me, the first time he says, if he knew what he was doing or whatever, then he should get the death penalty, but if he's like for some reason off or whatever, then maybe just something prison like that. Is that what you mean? And that's on page 1325. And the defense attorney, to confuse matter worse, says, no, no, no, you're way off. You're way off there, which is not accurate. The accuracy of Ohio's process is this. The defense attorney has to offer evidence of mitigation. He has the initial burden. There's no presumption that you're brain damaged. There's no presumption that you're mildly mentally retarded. There's no presumption that you had a bad childhood. There's no presumption that you have alcohol and suffer from alcohol and substance abuse. You must put witnesses on the stand and offer that testimony to say, here are my mitigating factors that I've established. And then the jury is instructed on such. Then the burden shifts. This is State v. Jenkins. This has been the law in Ohio forever. And then it shifts back to the prosecution to prove that the overall aggravating factors outweigh the mitigating factors. So when he was talking about, to prove that, he was talking about, he was giving his understanding of what Ohio law is, one, without the benefit of jury instructions. I mean, that is not an easy task. He's never even been instructed by the court of Ohio's process, yet the district judge has this belief that he's got to answer all these answers correct. And when he's asked an open-ended question, like, how does mitigation work in Ohio, sir, by a defense attorney, if he doesn't get the burden shifting right, he's out. That can't be the law. The law is, would he be, is he precluded from considering the evidence of mitigation and would only impose death? He never said anything remotely close to that. He never said he would never follow the court's instructions. He never said, I would automatically impose death. And he never said, I would not consider mitigation. I see that my time's up. If you have any questions, I can answer them or I can come back in a little bit. We do not. Thank you. Thank you. May it please the court. Under clearly established federal law, a merciless juror is a lawless juror. Juror 139 expressed views in voir dire that showed that his views about the death penalty would substantially impair his ability to serve in the penalty phase of James Trimble's trial. This is a structural error requiring reversal, as the district court found. As a preliminary matter, your honors, there's a dispute over the standard of review. And we've argued in our brief and in our 28-J letter that we're entitled to de novo review. And we don't concede our claim to de novo review. But to simplify matters for argument, I would like to focus on why the district court's opinion granting relief under AEDPA should be affirmed. Certainly, if Trimble is entitled to relief under AEDPA, he would necessarily be entitled to relief under de novo review. Of course, if the court has any questions about our position on de novo review, I'll be happy to address those. The district court found that the Ohio Supreme Court did not actually enforce its procedural rule and it adjudicated the claim on the merits. After affording all the deference that was due to the state court decision, the district court reached its conclusion that juror 139's beliefs were not, that his protestations of impartiality were not believable. So for the sake of argument only, that AEDPA deference applies, the district court got it right when it found that juror 139's views impaired his service in the penalty phase. Is it AEDPA deference when we look at what the trial judge who presided over the voir dire, when we look at the credibility determinations that he made, isn't that just the factual determinations that we ordinarily give deference to on appeal? And that's not the double deference that we're talking about under AEDPA. The district court seems to have said, I can tell better on this cold record whether this guy was believable than the trial court who was questioning him could. Is that appropriate? Yes, Your Honor, it is. And despite AEDPA deference, the test in Patton v. Yount for juror credibility determinations leaves the habeas court with work to do. And we know that from two AEDPA cases decided by this court. One is Wolfe v. Brigano, which was an AEDPA case, where ultimately this court determined that the jurors' protestations of impartiality under the Patton test were not believable. And the other is a juror bias case on the death penalty, which is White v. Mitchell, another AEDPA case, where ultimately the habeas court determined that the jurors' protestations of impartiality were not believable. True, under the case law, juror bias claims are entitled to some special deference, as the court said in Patton, with regard to the trial court's findings. But my opponent has greatly exaggerated what the trial court actually found. Following the challenge for cause by Trimble's counsel, the trial court simply said that juror 139 indicated a willingness to follow the law, not that the trial court found that the juror would follow the law. Moreover, another reason for denying the challenge for cause was that the trial court found that the juror would require the state to prove the aggravating circumstances in the first phase. But that's beside the point, Your Honor, because the point is for the determination under the Morgan inquiry is whether, after finding the defendant guilty of an intentional murder with aggravating circumstances, that that juror can still impose a life sentence. If you're willing to follow the law, I'm willing to follow the law here. That means I'm going to follow the law, right? And if that juror said he'd follow the law, why? If he's willing to do it, why isn't that good enough? Well, as the district court correctly noted, Your Honor, in every juror case that's reviewed, there are some assurances by the juror that he can follow the law and consider evidence. I don't know whether that's a valid point or not. Well, I think it is. I've tried a lot of cases too, and if they say they're willing to follow the law and you explain it to them, they follow the law. I mean, we have to follow that. Well, if a juror said that he wouldn't follow the law or consider evidence, I think it's safe to say that any state trial judge would remove that juror for cause. Did he say he wouldn't follow any evidence? No, that's not what he said. But the point is that with regard to the juror claim to determine the protestation of impartiality being believable, you have to look at the whole record. And the state courts discounted the whole record. They were focusing myopically so on isolated incidences where the juror agreed to follow the law. But if you take the voir dire in its context and look at the whole record the way that the district court thoroughly examined it, we see that this juror was never able to set aside his opinions, biased opinions regarding the death penalty. And if I may go through the voir dire for a minute or two with you, I think it becomes clear what happened in this case. First you had the trial court ask the juror a couple of questions if he could consider the evidence and return a verdict for either life or death, and the juror gave answers that he could do that. Then the prosecutor had the voir dire of the juror, and the prosecutor asked the juror if the juror was an automatic death penalty juror, and the juror said that he was. So then after that, the prosecutor went through the process of Ohio law explaining the burden of proof on the state, and mitigation evidence has to be considered, and there's a determination in the first phase before getting to the second phase. And the juror gave yes answers to all those questions. Then defense counsel, and this is an exaggeration by my opponent what happened, it wasn't defense counsel playing the Colorado method, which is not even in the record or in the case law that we're talking about, so I'm not sure where that's coming from, but it's certainly not in the record. But defense counsel asked the juror if he had ever discussed his views on the death penalty, not what his views were, but if he had discussed his views with anyone. And that's a simple question that can be answered yes or no, and at that point the jurors gave an automatic death penalty answer to an open-ended question, or to a rather specific question of whether he had ever discussed his views. And after that the juror expressed three more times automatic death penalty views when asked what his mindset would be going into the penalty phase. So then defense counsel takes some time over three pages of transcript, or I think it's pages 1323 to 1326 of the trial transcript, and again, like the prosecutor, explains the process. You have to find Trimble guilty of intentional murder, which is a purposeful murder, or a murder with prior calculation and design, and you have to consider mitigation evidence, and those findings are made in the first phase before you get to the second phase. And then after going through that question and getting with the juror, the juror says statements that if the defendant knew what he was doing and if he was guilty, then he should get the death penalty. And then the last colloquy with the juror and defense counsel is, if you'll bear with me for a moment please, that was on page 1328 and 1329 of the transcript. And the juror says if he knew what he was doing at the time and had a clear head, plan it out, then he should get the death penalty. Now, of course, it's been explained to the juror at this point that in order to get from the first phase of eligibility to the second phase, you have to prove that the defendant intentionally killed. In other words, he knew what he was doing. You can't have a death penalty for an accidental crime. And then the juror qualifies it some by saying, if he was under the influence or something not quite right in the head, if you can prove that, then maybe it shouldn't be so harsh. So what we see here is a juror who starts out telling the prosecutor he's an automatic death penalty juror. Then a juror whose position evolves to if the defendant knew what he was doing and he was guilty, then he should get the death penalty. But, of course, you can't give anyone the death penalty in Ohio unless they know what they're doing and they're guilty. And then as the district court correctly found, the juror's final position wound up being essentially a rebuttable presumption of death. The juror presumed that Trimble should get the death penalty unless Trimble could prove some sort of diminished capacity, in which case maybe the punishment wouldn't be so harsh. Now, contrast this fact pattern with the case that the district court considered in Williams v. Bagley, which this court affirmed was an AEDPA case. And Judge Gwynn presided over Williams v. Bagley and also this case. So it's clear that Judge Gwynn knows how to afford AEDPA deference and it's clear that Judge Gwynn also understands the patent test and how to assess a juror claim. What happened in Williams v. Bagley was that there was a juror who was faced with an alternative of the death penalty and life with the possibility of parole. And the juror said that she would not give life without, or excuse me, the juror was faced with a choice between the death penalty and life with the possibility of parole because it was under Ohio's old law before we had LWOP in Ohio. And the juror said that rather than give life with the possibility of parole, she would give the death penalty. But by the end of the voir dire, that juror, Edelman, in the Williams v. Bagley case, said that she would consider both penalties equally. And Judge Gwynn denied the writ in that case and this court affirmed. Now what that shows is that the proper analysis for showing a juror's protestations of impartiality to be believable or not believable are the juror has a position, a biased opinion, but through voir dire, at the end of voir dire, the juror surrenders that position as willing to consider everything fairly and equally. In this case, the juror, when asked about his opinion, starts out as an automatic death penalty juror an eye for an eye in every case. Then it evolves somewhat to the position of if Trimble knew what he was, or if the defendant knew what he was doing and he's guilty, then I'll give him the death penalty. And then finally, as the district court correctly analyzed, the juror is left at the end of the day with the position that there's a presumption of death unless Trimble can rebut it in the penalty phase. Did that juror ever say he'd follow the instructions of the court? Yes, Your Honor, he did say that. That's sort of the final statement to make, isn't it? But it can't be... People come in to court all the time with strange ideas about the law and all this one thing and others see it on TV and if they'll follow the instructions of the court, that's the main thing, right? Well, no, it's not, Your Honor. And again, I would point, Your Honor, to the Wolfe v. Bregano case and White v. Mitchell and also Franklin v. Anderson and in all those cases, the jurors have given some assurance to follow the law and consider evidence. But at the end of the day, there has to be some fair assurance on the record that the juror can set aside those opinions and fairly consider the case. And if the jurors' protestations are not believable, as this court has found in two AEDPA cases, then habeas relief is required. If you look at the Ohio Supreme Court's opinion, it starts out... Here's how it reads. The Ohio Supreme Court notes that the juror stated an eye-for-an-eye position and that would be his mindset going into the penalty phase. And then the Ohio Supreme Court said three things. The juror said he could follow the instructions of law, consider the evidence, and require the state to prove aggravation outweighed mitigation beyond a reasonable doubt. So if you read the Ohio Supreme Court's opinion, it reads like what happened in Williams v. Bagley, that the juror has a biased opinion and then surrenders it, and that's what we have at the end of the day. But that's not what the whole voir dire record shows. And the district court's analysis was very thorough, and what it demonstrates is to determine whether a juror is believable, the court has to engage with the whole voir dire record and not just take some isolated statements of assurances by a juror to follow the law. Because the juror told the trial court, Your Honor, that he could follow the law, and then after saying that, he went to his position of automatic death penalty. And then the juror told the prosecutor that he could follow the law and consider evidence. And after telling the judge and the trial court and the prosecutor that he could follow the law and consider the evidence, the juror then continued to maintain those beliefs. So this juror is very much like the juror in Franklin v. Anderson, Juror Arthur, who had a continued misunderstanding of what the law was and was not able to give that up. Are you admitting that the Supreme Court of Ojai ruled in the alternative? I am not, Your Honor. We do not concede our claim to de novo review, but again... The state says they did. Did they not say that, that alternatively we go on the merits of this? No, they didn't say alternatively. What the Ohio Supreme Court's opinion reads is there are several claims for juror bias in the penalty phase, and they break them out into three groups, and they lump several jurors together in one section and address those jurors, and then they say, we find no plain error. And then there's Juror 133 that was also challenged for cause and was removed with a peremptory challenge as an alternate. And at the end of that discussion, the Ohio Supreme Court says, we find no plain error. And then wedged between those two analysis is the discussion of Juror 139, who's the juror in this case, and the Ohio Supreme Court makes its finding of I for an I juror said he could follow the instructions, et cetera. But then at the end of that paragraph, it doesn't say no plain error. So I believe that's the reason why the district court found that the Ohio Supreme Court did not enforce the procedural rule in this case. But if it was not going to make an alternative ruling, why would it even discuss that? I thought it said there was a procedural default there. Well, state courts are always free to overlook a procedural bar and reach a claim on the merits, which goes to Judge Clay's question to my opponent, which is if the Ohio Supreme Court does not actually enforce a procedural rule, then it's a merits ruling. Well, that's the reason that they kicked it out because the judge says he didn't preserve it because it should have had a peremptory challenge. But in the alternative, as I understand, they said, well, there's no error here. No, Your Honor. They never used the word alternative in their discussion. Okay, they didn't say alternative. They never used the word alternative in their discussion. Why did they even have to put in there about an I for an I and a tooth for a tooth if they've already said there's a procedural default? Well, that's why the district court found that no procedural default was enforced by the Ohio Supreme Court. That's just surplusage. No, what the district court found was that was a merits determination. Okay. And of course, whether there's a procedural default or not is not entitled to epidefference. That's an independent federal question under Lee v. Kenman, Osborne v. Ohio. So I believe my opponent misstated that. So you're saying that when the Supreme Court said, however, Trimble has waived any objection to these overruled challenges because of his failure to exhaust his preemptory challenges, we find that no plain error was committed in declining to grant the defense challenges, you're saying that that's not an alternative ruling? No. I mean, I'll grant you they don't say alternatively, we find, but there's no point to go to it at all unless they're saying, you know, on the one hand, there's probably a procedural default, but if there isn't, then on the other hand, there's no plain error. Our position is that that's plain error review, which is a default under this court's established law, which is the dispute on the standard of review. So our position as Appley was that the Ohio Supreme Court applied a plain error analysis. What the district court found was the Ohio Supreme Court's analysis was a merits ruling, not a default analysis, and applied epidefference to it. But we're saying that what the Ohio Supreme Court did was apply a plain error analysis to the claim, and as a result, review is de novo. But for the purposes of argument today, I'd just like to assume that if this court follows the district court's reasoning, under AEDPA, relief is still required. Again, Your Honors, as in White v. Mitchell and Wolf v. Bergano, epidefference does not relieve the habeas court of its responsibility to determine under the patent test whether a juror's protestations of impartiality are believable. The district court did the work required under the patent test, but the state courts did not. The Ohio Supreme Court's factual determination was unreasonable because it simply looked at isolated assurances by the juror that were contradicted on the face of the whole record. And the Ohio Supreme Court discounted evidence showing that the juror began with an automatic death penalty belief and continued to maintain those beliefs throughout voir dire, and at the end of voir dire were simply left with a presumption by the juror going into the penalty phase that Trimble should get death unless he could prove diminished capacity. But of course, by that time, it had been explained to the juror by both the prosecutor and defense counsel that it was the state's burden of proof all the way through the penalty phase. And under Ohio law, the defendant carries no burden of proof, only a burden of production to go forward with mitigation. The burden of proof always rests with the state in the penalty phase. But as the district court correctly found, the juror's last statement shows that he was creating a presumption of death going into the penalty phase unless Trimble could rebut the presumption. He never said if Trimble can rebut this. He never said if he can rebut this. He used a sort of a generic you. Then if you find that he's not, or if you show, he says, if you show that he's not in his right mind or something, then you're left with something less than death. Right, but what we need to focus on is the statement preceding that, where the juror says if he knew what he was doing at the time, had a clear head, knew what he was doing, planned it out, then he should get the death penalty, which is consistent with every statement that he's made up to that point, that he was for the death penalty if the defendant knew what he was doing and was proved guilty. But you're saying that he is putting a burden on the defendant to show that he didn't know what he was doing by that statement? That that statement shows a shift of the burden of proof? No, Your Honor, that statement shows... Because the next statement is when he says, generically, as I read it, well, okay, if you show that he didn't know, that he wasn't right in the head or there was something wrong, then you're left... Yes, Your Honor, that second portion of the statement demonstrates what it shows is he's still sticking with his belief that if a defendant knows what he's doing and he's guilty, he should get the death penalty. That's the presumption, and then he's saying, but if Trimble can prove... He's not using the word Trimble, I beg your pardon on that. Aren't we expecting him to be kind of a lawyer here? Especially when you look at how the questions were framed by both sides leading up to all of this? Anybody thinks that this was a very clearly structured set of questions to bring somebody through who has no experience whatsoever with the law, let alone selection of juries, let alone understanding how the death penalty is applied. It's kind of alarming. I don't think it is requiring to be a lawyer, Your Honor, and here's why. Both parties went to great lengths to explain to the juror what the Ohio process was, and the other jurors that made it through were able to grasp that process. And despite having the process explained to the juror, he continued to express beliefs that showed a misunderstanding of the law, as the district court found, and I think quite similar to Juror Arthur in the Franklin case. But again, assuming that epidefference applies, the patent test still leaves the habeas court with work to do. And in this case, unlike the state courts, the district court conducted a very thorough, engaged analysis with the whole record, and at the end of that review of the record found that the jurors' protestations were not believable because the juror stated automatic death penalty beliefs and then continued to state beliefs that a defendant should get the death penalty if he knew what he was doing, and it was explained to the juror repeatedly that in order to get to the penalty phase, the defendant had to be proven guilty of an intentional murder and he knew what he was doing. So unlike the Williams case, where we start with a juror with a fixed opinion who, at the end of that fixed opinion, is willing to abandon it and say, okay, I'll consider both penalties equally, in this case we have no fair assurance on the record that this juror ever truly was willing to abandon his belief that a defendant who knew what he was doing and was guilty should be presumed to get the death penalty. Well, when this juror actually was impaled was after the guilt process in the case. Correct, Your Honor. So he just had to determine whether the aggravating circumstances were greater than the mitigating circumstances. So he didn't have to decide guilt or innocence at all, right? But that's the problem, Your Honor. By the time that the juror made it under the jury, his burden was already satisfied. Guilt had already been determined by the time he came on. Yes, Your Honor, and that's the problem with the juror under Morgan, is that you're dealing with a juror whose views are impaired, substantially so, because that juror believes that a defendant who's been found guilty should receive the death penalty and not have an open mind on punishment. Well, he's already been found guilty of murder, right? Yes, Your Honor, that's true. You know that you've got to put up mitigating circumstances at that point, right? I mean... No, but there's no... You do, that's true, Your Honor. You do have to put up mitigating circumstances at that point. You say you have any. So at that time, your client has been convicted of murder, right? When this juror comes in, sits in the jury box. That's correct, Your Honor, but with all due respect, I think that's beside the point, like the trial court found. The issue is whether after finding a defendant guilty of an intentional murder, can the juror who's in question be fair with assessment of punishment? And when you have a juror who thinks that a defendant who should be presumed to get the death penalty, if he knew what he was doing and he's guilty, that's the inherent fairness. That's a substantial impairment. So simply finding that the state has to prove his guilt is just the first step in the matter. At the end of the day, a juror can't presume death under the Ohio scheme going into the penalty phase because it's the state's firm to prove it beyond a reasonable doubt. Did he use that term, I presume death? He didn't say that, did he? He didn't, but the whole... He wasn't sophisticated. He was probably a guy off the street. We don't know anything about his background, do we? I mean, he's a worker or farmer or a person without much education. He's entitled to sit on the jury just as much as the HD. Sure, as any citizen is, but the point is we were able to seat other jurors in this case who could grasp the law. And this juror did have a presumption, as the district court correctly found, because it's clear from his last statement. He's saying if he knew what he was doing at the time, planned it out, then he should get the death penalty. But if Trimble can prove diminished capacity, then maybe the punishment shouldn't be so harsh. So that's why the district court, after considering the whole record thoroughly, concluded that at the end of the day, all we have is not a juror who's given fair assurances to be fair and impartial in the sentencing phase, but we have a juror who starts with a presumption of death requiring Trimble to rebut the presumption. Unless the court has any more questions, I'll conclude. Again, Your Honors, although if epidefference applies to, as the trial court correctly found, that doesn't relieve the habeas court of the responsibility ultimately to determine if the jurors' protestations of impartiality are believable. And as White v. Mitchell and Wolfe demonstrate, the test and patent still leaves the habeas court with work to do. The district court thoroughly examined the record, and after doing so, it found that there were no fair assurances that the juror 139 could set aside his beliefs and that his beliefs substantially impaired his ability to serve in the penalty phase upon finding Trimble guilty of an intentional murder in the first phase. So we ask this court to affirm the district court's opinion granting habeas relief in the penalty phase where there may be a remand of the state court and Mr. Trimble may have a fair and impartial jury for a penalty phase. What about the prosecutorial misconduct issue? Do you have anything to add beyond what you have in your brief? Yes, Your Honor. I'll just note that the Ohio Supreme Court's decision, that was a merits decision on direct appeal, and epidefference applies. But epidefference, the determination under clear federal law, under D-1, is unreasonable for two reasons. The first was that the Ohio Supreme Court assessed each error individually of prosecutor misconduct rather than cumulatively, and this court said in Slagle v. Bagley, relying on the Berger case from the United States Supreme Court, that prosecutor misconduct ultimately has to be assessed cumulatively. And the other problem with the Ohio Supreme Court's analysis is that it focused too much on finding that there was overwhelming evidence of guilt, which is irrelevant to a penalty phase prosecutor misconduct determination, as this court made clear in Depew v. Bates v. Bell. The issue is not overwhelming evidence of guilt, which can be a relevant factor for trial phase misconduct, but for penalty phase misconduct it can't be, as this court said in Bates. And also, I think the Ohio Supreme Court was unreasonable in dismissing Trimble's mitigation as unremarkable. The Ohio Supreme Court reviews scores of cases under its independent sentencing review, so perhaps it may find it unremarkable, but to a juror who's off the street and is unfamiliar with a capital case and is sitting there for the first time in a capital case, the mitigation evidence can't be so lightly dismissed as remarkable. Trimble had an extensive mitigation case in the penalty phase, including evidence of mental illness and evidence that he'd been a good and dependable worker and had a good character and was regarded highly by people that he was familiar with. So those are the reasons, Your Honor, why I would say that the Ohio Supreme Court's assessment was objectively unreasonable. All right. Thank you. Thank you. Rebuttal? Yes, ma'am. The Constitution does not prohibit jurors who views favor or disfavor capital punishment. That means jurors cannot have to be totally ambivalent to the issue of the death penalty in order to serve. And that's an important distinction here because what the district court couldn't get over is that there's no question that this defendant had personal views that favored the death penalty. But that's not the test. The test is whether those views would substantially impair his ability to serve and follow instructions. The district court then made a leap of logic and said, well, when they asked him open-ended questions about how he understood Ohio's sentencing scheme, well, he just got that all wrong. So therefore, because he couldn't quite articulate Ohio's bifurcated process in a manner that fits, that I find reasonable, I'm going to say that this substantially impaired his ability to follow the law. There is no United States Supreme Court case that suggests that, that suggests that, like as you said, that he has to be a lawyer and that he can't. In fact, the Supreme Court has said just the opposite. The Supreme Court has said, I quote, and this is from the Patton case, a jury does not have an obligation to express themselves carefully or even consistently. He definitely had trouble articulating his understanding of Ohio's bifurcated process when it just got explained to him five minutes ago and he hadn't even yet received his instructions. And that's what jury, that's what deliberations are for. So they go back, they read the instructions, they talk about the instructions, and they do their best to apply the facts to the law. Here he never said, no, no. In all these cases that are relied upon here, those are situations where there was flip-flopping going on, where one minute he was like, no, I don't think I can be impartial, and then the next minute, yes, I'll follow the law, then it goes back and he's, no, I don't think I can be impartial. Here it never even went back to the prosecutor. Here the defense attorney kept asking him about his personal beliefs. The defense attorney knew what his personal beliefs were. He just wanted to hear him say them over and over again. And the trial judge finally got this and said, hey, hold up, hold up. Make your questions clear. And then when he focused his questions on what Ohio law is, that's when he said these two statements, which were, if he knew what he was doing and had a clear head, knew exactly, planned out, then he should get the death penalty. But if he was under the influence or something and not quite read in the head and then he can prove that, then maybe it shouldn't be so harsh. That is not so notorious and off as to render him unfit for service. Basically, he didn't put the word way in there. He didn't put the word way in the sentence. And as the Supreme Court has recently noted in White v. Woodall, states typically place the burden to prove mitigating factors at the penalty phase on the defendant. That's a quote. In State v. Jenkins, 15 Ohio State 3rd, 164, 177, the burden rests with the defendant to proffer evidence and establish mitigating factors. Then the ultimate burden shifts back to the prosecution. In every habeas petition I've ever had to file return of writ in, there's always a claim that the death penalty scheme is unconstitutional because they have put the initial burden on the defendant and mitigation. Well, that makes perfect sense. You're not presumed to be brain damaged. You're not presumed. You've got to put people on the stand and say, hey, when he was a little boy his mommy beat him too much or when he was a little boy he fell and hit his head. And then the jury has something to work with. If we have one of these situations where the defendant says, no, no, no mitigation, no, no, my parents are good. This happens often where they're like, no, I'm telling you, do not put on mitigation. The instruction to him is say, sir, you will get the death penalty if you offer no mitigation because you have nothing to weigh against the aggravating factors. So of course he has the initial burden. And the fact that what makes this decision by the district judge so troubling is that he tested this juror as if this was a bar exam or a law school exam. Like, oh, no, not quite right. You don't get Ohio law. You're out. There's no Supreme Court case that says you've got to ace Ohio's bifurcated process and the method of how mitigation is presented before you even get your instructions. And that's what the juror never said, I will not follow the law because I am so ingrained in an eye for an eye that that's the only way I think. So don't waste your time. They would have immediately excused him. But he said he did his best without even having to go back to the prosecution's question. He did his best and articulate. And the most important thing here is that it was the trial judge who observed this, who personally observed this guy, made factual findings. No one here or the district judge have ever seen Juror 139. No one. It's easy for him to second-guess that decision, but I would ask that you give deference to the Ohio Supreme Court's affirmance of the trial court's factual findings. Thank you. Thank you, counsel. The case will be submitted. There being nothing further this afternoon, the clerk may adjourn the court.